FILED by _____ AW ___ D.C.

May 18, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. ___23-80090-CR-CANNON/REINHART___

18 U.S.C. § 1343
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 1957(a)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

**UNITED STATES OF AMERICA**

**vs.**

**DYVONE CODIA CARTER,**

        **Defendant.**
_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

### Economic Injury Disaster Relief Program

#### The Small Business Administration

1.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

2.     As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders. The federal government backed these loans.

### The Economic Injury Disaster Loan Program

3.     The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

4.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having.  The advances did not have to be repaid.

5.     In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant was further required to certify that it was not engaged in any illegal activity and that all of the information in the application was true and correct to the best of the applicant's knowledge.

6.     EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the

application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

7.     Qualifying businesses were able to modify their original EIDLs under the program by increasing the loan amount to reflect an additional 12-month period of economic injury or a maximum of $500,000, whichever was less. An increase could be requested after accepting the original loan. To apply for such a loan modification, borrowers were asked to disclose any changes to their revenue and cost of goods sold since the original EIDL application was submitted. The SBA could require borrowers to submit updated financial information, to include updated information regarding the company's gross revenue and cost of goods sold.

8.     The SBA Office of Disaster Assistance controlled the EIDL program and was headquartered in Washington, D.C. EIDL applications were received by an SBA server located in Iowa. The SBA processed the loan payments at its office in Denver, Colorado.

### The Defendant and Related Entities and Individuals

9.     Dyvone Langel, P.A. ("Dyvone Langel") was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach County, Florida, and held an account ending in 4515 at Bank United (the "Dyvone Langel Account").

10.    Butterfly Interactions LLC ("Butterfly Interactions") was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach County, Florida, and held an account ending in 1236 at SunTrust Bank (the "Butterfly Interactions Account").

11.     Carter Holdings Central FL LLC ("Carter Holdings") was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach County, Florida, and held an account ending in 8910 at J.P. Morgan Chase Bank (the "Carter Holdings Account").

12.     Defendant **DYVONE CODIA CARTER**, a resident of Palm Beach County, Florida, was owner and president of Dyvone Langel, Butterfly Interactions, and Carter Holdings, and held a personal account ending in 1051 at J.P. Morgan Chase Bank (the "Carter Account").

13.     Company A was a company incorporated under the laws of Florida, with its principal place of business in Broward County, Florida. Company A provided title and mortgage closing management services to buyers and sellers of real property.

14.     Company B was a company incorporated under the laws of Pennsylvania, with its principal place of business in Allegheny County, Pennsylvania. Company B provided title and mortgage closing management services to buyers and sellers of real property.

## COUNTS 1–4
### Wire Fraud
### (18 U.S.C. § 1343)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around March 2020 through in or around July 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### DYVONE CODIA CARTER,

did knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and

4

foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.     It was a purpose of the scheme and artifice for the defendant to unlawfully enrich herself by: (a) submitting and causing the submission, via interstate wire communication, of false and fraudulent applications for EIDL loans and cash advances made available through the SBA to provide relief for the economic effects caused by the COVID-19 pandemic; (b) concealing and causing the concealment of these false and fraudulent applications; and (c) diverting fraud proceeds for her personal use, the use and benefit of others, and to further the fraud.

## THE SCHEME AND ARTIFACE

The manner and means by which **DYVONE CODIA CARTER** sought to accomplish the purpose of the scheme and artifice included, among others, the following:

4.     **DYVONE CODIA CARTER** executed false and fraudulent EIDL loan agreements and loan modification agreements with the SBA on behalf of two companies she owned and controlled. These fraudulent loan agreements sought funds in the approximate aggregate amount of $242,200.

### *The Fraudulent Butterfly Interactions EIDL*

5.     On or about March 31, 2020, **DYVONE CODIA CARTER** submitted, and caused the submission of, an EIDL application in the name of Butterfly Interactions seeking an EIDL (the "Butterfly EIDL Application"). In the Butterfly EIDL Application, **CARTER** falsely represented, among other things, that the company's gross revenues for the twelve months prior to the date of the disaster were $30,000.

6.     On or about April 21, 2020, based on false and fraudulent representations made in the Butterfly EIDL Application, the SBA deposited $2,000 in the form of an EIDL advance into the Butterfly Interactions Account.

7.     On or about May 27, 2020, **DYVONE CODIA CARTER** submitted, and caused the submission of, an EIDL Loan Authorization and Agreement for Butterfly Interactions in the approximate amount of $7,000 (the "Butterfly Loan Agreement"). In the Butterfly Loan Agreement, **CARTER** falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

8.     Based on false and fraudulent representations made in the Butterfly EIDL Application and Butterfly Loan Agreement, the SBA approved the Butterfly Interactions EIDL and deposited approximately $7,000 into the Butterfly Interactions Account.

9.     On or about April 26, 2021, **DYVONE CODIA CARTER** submitted, and caused the submission of, an application seeking a modification of the Butterfly Loan Agreement. In the modification application, **CARTER** falsely recertified, among other things, that Butterfly's gross revenues for the twelve months prior to the date of the disaster were $30,000. The SBA declined to modify the Butterfly Loan Agreement.

### *The Fraudulent Dyvone Langel EIDL*

10.     On or about March 31, 2020, **DYVONE CODIA CARTER** submitted, and caused the submission of, an EIDL application in the name of Dyvone Langel (the "Langel EIDL Application"). On or about April 21, 2020, the SBA deposited $1,000 in the form of an EIDL advance into the Dyvone Langel Account.

11.     On or about May 27, 2020, **CARTER** submitted, and caused the submission of, an EIDL Loan Authorization and Agreement for Dyvone Langel in the approximate amount of $31,500 (the "Langel Loan Agreement"). In the Langel Loan Agreement, **CARTER** falsely and fraudulently certified that she would "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter..."

12.     Based on the false and fraudulent representations made in the Langel Loan Agreement, the SBA deposited approximately $31,400 into the Dyvone Langel Account. **DYVONE CODIA CARTER** used the funds received from the SBA for, among other things, a down payment on the purchase of real property sent by wire transfer to Company A. Those payments were made for personal purposes and not for any of the approved business purposes allowed by the Langel Loan Agreement or Langel Modification Agreement.

13.     On or about April 25, 2021, **DYVONE CODIA CARTER** submitted, and caused the submission of, an application seeking a modification of the Dyvone Langel EIDL. The SBA approved the application for modification, and on or about July 16, 2021, **CARTER** submitted, and caused the submission of, an EIDL Loan Authorization and Agreement for Dyvone Langel in the approximate amount of $208,200 (the "Langel Modification Agreement"), to include the amount already approved in the original Dyvone Langel EIDL loan agreement executed on May 27, 2020. In the Langel Modification Agreement, **CARTER** falsely and fraudulently recertified, among other things, that she would use the modification funds "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter..."

14.     Based on the false and fraudulent representations made in the Langel Modification Agreement, the SBA deposited approximately $176,700 into the Dyvone Langel Account. **DYVONE CODIA CARTER** used the funds received from the SBA for, among other things, down payments on the purchase of real property sent by wire transfer to Company A and Company B and the purchase of a car. Those payments were made for personal purposes and not for any of the approved business purposes allowed by the Langel Loan Agreement or Langel Modification Agreement.

### USE OF WIRES

15.     On or about the dates specified as to each count below, the defendant, **DYVONE CODIA CARTER**, for the purpose of executing and in furtherance of the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, as particularly described below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE |
|-------|------------------|---------------------|
| 1 | May 27, 2020 | Electronic transmission of the Langel Loan Agreement, from the Southern District of Florida, to the SBA through servers outside of Florida. |
| 2 | May 27, 2020 | Electronic transmission of the Butterfly Loan Agreement, from the Southern District of Florida, to the SBA through servers outside of Florida. |
| 3 | April 26, 2021 | Electronic transmission of the Butterfly EIDL modification certificate of completion, from the Southern District of Florida, to the SBA through servers outside of Florida. |
| 4 | July 16, 2021 | Electronic transmission of the Langel Modification Agreement, from the Southern District of Florida, to the SBA through servers outside of Florida. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 5
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i))

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.     On or about November 2, 2020, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### DYVONE CODIA CARTER,

did knowingly conduct, and attempt to conduct, a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, that is, a check written in the approximate amount of $10,000 from the Carter Holdings Account to Company A knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

It is further alleged that the specified unlawful activity was wire fraud, in violation of Title 18, United States Code, Section 1343.

## COUNTS 6-7
### Money Laundering
### (18 U.S.C. § 1957(a))

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates specified below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**DYVONE CODIA CARTER,**

did knowingly engage in, and attempt to engage in, monetary transactions affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, as more particularly described below:

| Count | Approximate Date | Description of Transaction |
|---|---|---|
| 6 | October 21, 2021 | Electronic wire transfer in the approximate amount of $56,531 from the Dyvone Langel Account to Company B. |
| 7 | November 29, 2021 | Electronic wire transfer in the approximate amount of $51,406 from the Dyvone Langel Account to Company A. |

It is further alleged that the specified unlawful activity was wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATIONS

1.    The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for alleging forfeiture to the United States of America of certain property in which the defendant, **DYVONE CODIA CARTER,** has an interest.

2.    Upon conviction of a violation of Title 18, United States Code, Section 1343, as alleged in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.    Upon conviction of a violation of Title 18, United States Code, Sections 1956 or 1957, as alleged in this Indictment, the defendant shall forfeit to the United States any property,

real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

    4.    The property subject to forfeiture as a result of the alleged offense includes, but is not limited to, the following:

    a.    The real property located at 122 LIME RD NW, LAKE PLACID, FL 33852, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

Also known as:

Lot 5, in Block 61, of PLACID LAKES SECTION SIX, according to the Plat thereof recorded in Plat Book 7, Page 68, of the Public Records of Highlands County, Florida.

Parcel Identification No. C-14-37-29-060-0610-0050;

    b.    The real property located at 2900 FIORE WAY, UNIT 108-C (also known as 2900 FIORE WAY, UNIT 108C, also known as 2900 FIORE WAY, UNIT 1080), DELRAY BEACH, FL 33445, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

Also known as:

Condominium Unit 108-C of Lago Del Rey Condominium 4, According to the Declaration of Condominium as Recorded March 16, 1979 in Official Records Book 3025, Pages 74 through 119, of the Public Records of Palm Beach County, Florida, as amended, together with an undivided interest in the common elements appurtenant thereto.

Parcel Identification No. 12-43-46-19-18-004-1080; and

c. The real property located at 154 W CENTER AVE, SEBRING, FL 33870, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

Also known as:

Lot 15, Block 61, Original Town of Sebring, according to the Plat thereof recorded in Plat Book 3, Page 1, of the Public Records of DeSoto County of which Highlands was formerly a part, and recorded in Transcript Book, Page 6, of the Public Records of Highlands County, Florida.

Parcel Identification No. S-29-34-29-070-0610-0150.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

WILL J. ROSENZWEIG
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: _____

v.

**CERTIFICATE OF TRIAL ATTORNEY**

DYVONE CODIA CARTER,

_____/
Defendant.

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☒ WPB

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3.  Interpreter: (Yes or No) No _____
    List language and/or dialect: _____

4.  This case will take ___3___ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                    (Check only one)
    I    ☒ 0 to 5 days                  ☐ Petty
    II   ☐ 6 to 10 days                 ☐ Minor
    III  ☐ 11 to 20 days                ☐ Misdemeanor
    IV   ☐ 21 to 60 days                ☒ Felony
    V    ☐ 61 days and over

6.  Has this case been previously filed in this District Court? (Yes or No) No _____
    If yes, Judge _____ Case No. _____

7.  Has a complaint been filed in this matter? (Yes or No) No _____
    If yes, Magistrate Case No. _____

8.  Does this case relate to a previously filed matter in this District Court? (Yes or No) No _____
    If yes, Judge _____ Case No. _____

9.  Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No _____

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No _____

15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No _____

By: _____
Will J. Rosenzweig
Assistant United States Attorney
Court ID No.   A5502698

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**  Dyvone Codia Carter

**Case No:**

Count #s: 1–4

Wire Fraud

Title 18, United States Code, Section 1343
**\* Max. Term of Imprisonment: 20 years**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #: 5

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max. Term of Imprisonment: 20 Years**
**\* Max. Supervised Release: 3 Years**
**\* Max. Fine: $500,000 or Twice the Value of the Property Involved**

Count #s 6–7:

Money Laundering

Title 18, United States Code, Section 1957(a)
**\* Max. Term of Imprisonment: 10 years**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine:  $250,000 or Twice the Value of the Property Involved**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**